James E. Cecchi
Donald A. Ecklund
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

*Liaison Counsel for Plaintiff*

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RODEO COLLECTION LTD, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CARVANA CO., ERNEST GARCIA III, and MARK JENKINS,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rodeo Collection LTD ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Carvana Co. ("Carvana" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Carvana; and (c) review of other publicly available information concerning Carvana.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Carvana securities between May 6, 2020 and June 24, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Carvana operates an e-commerce platform for buying and selling used cars.

3.      On August 10, 2021, media reported that Carvana's dealer license was suspended for the Raleigh, North Carolina location for six months because "Carvana failed to deliver titles to the DMV, sold motor vehicles without a state inspection,

1

and issued out-of-state temporary tags and plates for vehicles sold to customers in North Carolina." On this news, the Company's stock fell $9.40, or 2.5%, to close at $360.70 per share on August 11, 2021, on unusually heavy trading volume.

4.     On October 22, 2021, before the market opened, *The Wall Street Journal* published an article entitled "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints," revealing that "[a]t least four states have disciplined Carvana or are investigating the company for violating vehicle-sales rules." On this news, the Company's stock fell $9.53, or 3.15%, over two consecutive trading sessions to close at $292.23 per share on October 25, 2021, on unusually heavy trading volume.

5.     On June 24, 2022, after the market closed, *Barron's* published an article entitled "Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars[,]" which stated that "[i]n its haste to seize market share from competitors, Carvana was selling cars faster than it could get them registered to their new owners." By early 2021, Carvana increased staffing and "would use its dealer licenses across the country to issue temporary license plates from multiple states to customers" to deal with the delayed registrations. Moreover, "Carvana's sense of urgency surrounding the title-transfer issues may be most apparent in its formation of the undriveable-car task force in May," which reviewed a "'giant spreadsheet' of cars . . . that Carvana had been keeping on the road with temporary plates that were now expiring . . . ."

On this news, the Company's stock fell $6.78, or 21%, over two consecutive trading sessions to close at $24.74 per share on June 28, 2022, on unusually heavy trading volume.

6.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Carvana faced ongoing issues with documentation, registration, and title for many of its vehicles across the country; (2) that, as a result, Carvana was issuing frequent temporary plates; (3) that the suspension of Carvana's license in North Carolina was not a "relatively unusual" action and, in fact, the Company was under investigation by many states for violating laws and regulations regarding proper documentation and inspections; (4) that, as a result of the foregoing, there was a substantial risk to Carvana's ability to continue business and/or expand its business in existing markets; (5) that Carvana was facing imminent regulatory action including license suspension in several states; (6) that, as a result of the foregoing, Carvana faced increased oversight in certain states, including Illinois; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.    Plaintiff Rodeo Collection LTD, as set forth in the accompanying certification, incorporated by reference herein, purchased Carvana securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.    Defendant Carvana is incorporated under the laws of Delaware with its principal executive offices located in Tempe, Arizona. Carvana's Class A common stock trades on the New York Stock Exchange ("NYSE") exchange under the symbol "CVNA."

14.    Defendant Ernest Garcia III ("Garcia") is the founder of the Company and has served as its Chief Executive Officer ("CEO"), President, and Chairman of the Company since 2012.

15.    Defendant Mark Jenkins ("Jenkins") was Carvana's Chief Financial Officer ("CFO") at all relevant times.

16.    Defendants Garcia and Jenkins (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided

with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Carvana operates an e-commerce platform for buying and selling used cars.

### Materially False and Misleading
### Statements Issued During the Class Period

18.     The Class Period begins on May 6, 2020. On that day, Carvana filed its quarterly report on Form 10-Q for the period ended March 31, 2020 (the "1Q20 10-Q"), which was signed by Defendant Jenkins. It contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Garcia and Jenkins attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

19.     The 1Q20 10-Q stated[1] the following regarding Carvana penetrating existing markets, omitting any ongoing issues with documentation, registration, and title of cars:

**Markets and Population Coverage**

***Our growth in retail units sold is driven by increased penetration in our existing markets*** and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck.

* * *

***We expect to launch many small markets near our existing infrastructure soon.***

* * *

**Revenue and Gross Profit**

***Our increased penetration in existing markets*** and expansion into new markets has led to growth in retail units sold. … Our largest source of revenue, used vehicle sales, totaled $964.3 million and $683.8 million during the three months ended March 31, 2020 and 2019, respectively. ***As we increase penetration in existing markets*** and expand to new ones, we expect used vehicle sales to increase along with retail units sold. We generate gross profit on used vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

* * *

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

> ***During our growth phase, our highest priority will continue to be providing exceptional customer experiences, increasing our brand awareness and building an infrastructure to support growth in retail units sold.*** …

20.     On February 25, 2021, Carvana filed its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 10-K"), which was signed by Defendant Garcia. Attached thereto were SOX certifications signed by Defendants Garcia and Jenkins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

21.     The 2020 10-K stated the following regarding Carvana penetrating existing markets, omitting any ongoing issues with documentation, registration, and title of cars:

### Our Growth Strategies

> The foundation of our business is retail vehicle unit sales. This drives the majority of our revenue and allows us to capture additional revenue streams associated with financing, VSCs and GAP waiver coverage, as well as trade-in vehicles. As we mature, we believe we will continue to improve conversion on these revenues and expand our offering of complementary products. However, all of these additional revenue opportunities are derived from retail vehicle unit sales and, as a result, our growth strategies are primarily focused on this metric.

> ***Our ability to generate vehicle sales is a function of our market penetration in existing markets, the number of markets we operate in, and our ability to build and maintain our brand by offering great value, transparency and outstanding customer service.*** Since launching Carvana eight years ago, our growth strategy has vaulted us to being the second largest used automotive retailer in the U.S. for the year ended December 31, 2020. ***We plan to continue growing our***

***vehicle unit sales, market penetration***, number of markets, and complementary product revenues while enhancing competitive positioning by executing the following key elements of our growth strategy:

***Increase Sales Through Further Penetration of Our Existing Markets***

We believe that our markets are at an early stage of growth when measured by market penetration. ***Our growth continues to be driven by further market penetration in our existing markets.*** For the year ended December 31, 2020, our markets opened in 2013 through 2019 grew by 35%, despite the impacts of COVID-19. We plan to continue marketing and actively building our brand image and awareness in existing markets by improving our operations, opening additional vending machines, and increasing our inventory size.

\* \* \*

**Markets and Population Coverage**

***Our growth in retail units sold is driven by increased penetration in our existing markets and expansion into new markets.*** We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck. Opening a new market involves hiring a team of customer advocates, connecting the market to our existing logistics network and initiating local advertising.

\* \* \*

**Revenue and Gross Profit**

***Our increased penetration in existing markets and expansion into new markets has led to growth in retail unit sales.***

\* \* \*

Our largest source of revenue, used vehicle sales, totaled $4.7 billion, $3.4 billion, and $1.8 billion during the years ended December 31, 2020, 2019, and 2018, respectively. ***As we increase penetration in***

***existing markets and expand to new ones, we expect used vehicle sales to increase along with retail units sold.***

\* \* \*

We sell used vehicles directly to our customers through our website. The price of used vehicles are set forth in the customer contracts at stand-alone selling prices which are agreed upon prior to delivery. We satisfy our performance obligation for used vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer. We recognize revenue at the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. Our return policy allows customers to initiate a return during the first seven days after delivery. … Revenue excludes any sales taxes, title and registration fees, and other government fees that are collected from customers.

\* \* \*

*Used Vehicle Sales*

The Company sells used vehicles directly to its customers through its website. The prices of used vehicles are set forth in the customer contracts at stand-alone selling prices which are agreed upon prior to delivery. The Company satisfies its performance obligation for used vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer. The Company recognizes revenue at the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. Estimates for returns are based on an analysis of historical experience, trends and sales data. … Prior to the delivery of the vehicle, the payment is received or financing has been arranged. … Revenue excludes any sales taxes, title and registration fees, and other government fees that are collected from customers.

22.     The 2020 10-K purported to warn that "***If*** we fail to maintain the high standards on which our reputation is built, or if an actual, or alleged failure of these standards occurs that damages this reputation, it ***could*** adversely affect consumer

10

trust and demand and have a material adverse effect on our business, sales, and results of operations." Moreover, "[e]ven the ***perception*** of a decrease in the quality of our customer service or brand could impact results." The 2020 10-K purported to warn of the following risk regarding regulatory compliance:

> *We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. Changes in these laws and regulations, or our failure to comply, could have a material adverse effect on our business, results of operations, and financial condition.*
>
> We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration***, state laws regulating the sale of motor vehicles and related products and services, federal and state laws regulating advertising of motor vehicles and related products and services, and federal and state consumer protection laws prohibiting unfair, deceptive or misleading practices toward consumers.
>
> \*     \*     \*
>
> The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results. We have incurred and will continue to incur capital and operating expenses and other costs to comply with these laws and regulations.

23.     The above statements identified in ¶¶ 18-22 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Carvana faced ongoing issues with documentation, registration, and title for many of its vehicles across the country; (2) that, as a result, Carvana was issuing frequent temporary plates; (3) that, as a result of the foregoing, the Company was under investigation by many states for violating laws and regulations regarding proper documentation and inspections; (4) that, as a result of the foregoing, there was a substantial risk to Carvana's ability to continue business and/or expand its business in existing markets; (5) that Carvana was facing imminent regulatory action including license suspension in several states; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

24.     The truth began to emerge on August 10, 2021, after the market closed, when media reported that Carvana's dealer license was suspended for the Raleigh, North Carolina location for six months. An article by ABC7 reported that "[d]ocuments show the hearing determined that Carvana failed to deliver titles to the DMV, sold motor vehicles without a state inspection, and issued out-of-state temporary tags and plates for vehicles sold to customers in North Carolina."

25.   On this news, the Company's stock fell $9.40, or 2.5%, to close at $360.70 per share on August 11, 2021, on unusually heavy trading volume.

26.   On August 11, 2021, while the market was open, Carvana participated at the J.P. Morgan 2021 Auto Conference where the analyst asked whether this was a widespread problem or "a very North Carolina specific issue." Carvana's Vice President of Investor Relations, Mike Levin, responded: "Yeah, just I think that there's always a lot of room for us to improve and the number one focus here is on customer experience. . . . *[T]his was a relatively unusual action but is also pretty small in scope, relatively speaking*."

27.   The above statements identified in ¶ 26 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Carvana faced ongoing issues with documentation, registration, and title for many of its vehicles across the country; (2) that, as a result, Carvana was issuing frequent temporary plates; (3) that the suspension of Carvana's license in North Carolina was not a "relatively unusual" action and, in fact, the Company was under investigation by many states for violating laws and regulations regarding proper documentation and inspections; (4) that, as a result of the foregoing, there was a substantial risk to Carvana's ability to continue business and/or expand its business in existing markets; (5) that Carvana was facing imminent regulatory action

including license suspension in several states; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

28.   The truth continued to emerge on October 22, 2021 when, before the market opened, *The Wall Street Journal* published an article entitled "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints," revealing that "[a]t least four states have disciplined Carvana or are investigating the company for violating vehicle-sales rules." The article stated, in relevant part:

> Consumers have filed dozens of complaints with state regulators and hundreds with the Better Business Bureau about issues that include incorrect paperwork, delays getting titles and registrations, and other troubles with the purchasing process. At least four states have disciplined Carvana or are investigating the company for violating vehicle-sales rules.
>
> ***In Michigan, the company is on probation after admitting to violating state laws including those governing title transfers and vehicle registration***, according to a document reviewed by The Wall Street Journal. ***The company has been assessed $10,500 in fines in Texas for paperwork issues, according to a state website. These actions haven't been previously reported.***
>
> A Carvana spokeswoman said the company remains firmly committed to improvement and is working hard to make the car buying and shopping experience better.
>
> "Carvana has pioneered online car buying by continuously delivering exceptional experiences, and we have bought and sold well over a million cars with customers," the spokeswoman said, adding that the company enjoys strong customer-satisfaction ratings.

Carvana didn't respond to questions about the state actions.

In August, Carvana received a six-month suspension from selling cars from its dealership in Raleigh, N.C., for violating the state's dealer-licensing laws, with another location put on probation for more than a year, according to the state's transportation department. That month, the company paid $850,000 to settle a civil lawsuit with four counties in California after selling and transporting cars without licenses to do so.

*      *      *

Last month, Carvana settled a different complaint in Florida after the state's motor-vehicles department found it had failed to provide title paperwork to 12 customers for up to eight months. The company paid a $6,000 fine.

*      *      *

The state of Michigan in May fined Carvana $2,500 for seven violations of state rules for vehicle dealers, including improperly issuing temporary registrations, state records show. Carvana also agreed to an 18-month probation, during which the state can suspend or revoke the company's license to sell cars if it fails to comply with Michigan law. Neither measure was announced publicly at the time.

29.    On this news, the Company's stock fell $9.53, or 3.15%, over two consecutive trading sessions to close at $292.23 per share on October 25, 2021, on unusually heavy trading volume.

30.    On February 24, 2022, Carvana filed with its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 10-K"), which was signed by Defendant Garcia. Attached thereto were SOX certifications signed by Defendants Garcia and Jenkins attesting to the accuracy of financial reporting, the disclosure of

any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

31.    The 2021 10-K stated the following regarding Carvana penetrating existing markets, omitting any ongoing issues with documentation, registration, and title of cars:

**Our Growth Strategies**

***The foundation of our business is retail vehicle unit sales.*** This drives the majority of our revenue and allows us to capture additional revenue streams associated with financing, VSCs and GAP waiver coverage, as well as trade-in vehicles. As we mature, we believe we will continue to improve conversion on these revenues and expand our offering of complementary products. However, all of these additional revenue opportunities are derived from retail vehicle unit sales and, as a result, our growth strategies are primarily focused on this metric.

***Our ability to generate vehicle sales is a function of our market penetration in existing markets, the number of markets we operate in, and our ability to build and maintain our brand by offering great value, transparency and outstanding customer service.*** Since launching Carvana nine years ago, our growth strategy has vaulted us to being the second largest used automotive retailer in the U.S. for the year ended December 31, 2021. ***We plan to continue growing our vehicle unit sales, market penetration, number of markets***, and complementary product revenues while enhancing competitive positioning by executing the following key elements of our growth strategy:

*Increase Sales Through Further Penetration of Our Existing Markets*

We believe that our markets are at an early stage of growth when measured by market penetration. ***Our growth continues to be driven by further market penetration in our existing markets.*** For the year ended December 31, 2021, our markets opened in 2013 through 2020 grew by 74%, despite the impacts of COVID-19. …

16

\* \* \*

### Customer Lifecycle

Search and Discovery. …

Virtual Tour. …

Seamless Transaction Technology. …

• *Documentation and payment*. To further improve the ease of financing, complementary products, and trade-ins, we have developed a seamless, **fully integrated online documentation process**. We have established partnerships with several technology providers that allow for automated down payment, income verification, and payment processing through simple, easy to use tools, **such as the ability to take pictures of required documents with a smartphone**.

\* \* \*

### Markets and Population Coverage

**Our growth in retail units sold is driven by increased penetration in our existing markets** and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and offer free home delivery to customers with a Carvana employee in a branded delivery truck.

\* \* \*

### Revenue and Gross Profit

**Our increased penetration in existing markets** and expansion into new markets has led to growth in retail unit sales. We generate revenue on retail units sold from four primary sources: the sale of the vehicles, gains on the sales of loans originated to finance the vehicles, wholesale sales of vehicles we acquire from customers, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, used vehicle sales, totaled $9.9 billion, $4.7 billion, and $3.4 billion during the years ended December 31, 2021, 2020, and 2019, respectively. **As we increase penetration in**

17

***existing markets*** and expand to new ones, we expect used vehicle sales to increase along with retail units sold.

* * *

*Used Vehicle Sales*

The Company sells used vehicles directly to its customers through its website. The prices of used vehicles are set forth in the customer contracts at stand-alone selling prices which are agreed upon prior to delivery. The Company satisfies its performance obligation for used vehicle sales upon delivery when the risks and rewards of ownership and control pass to the customer. The Company recognizes revenue at the agreed upon purchase price stated in the contract, including any delivery charges, less an estimate for returns. Estimates for returns are based on an analysis of historical experience, trends and sales data. …

Revenue excludes any sales taxes, title and registration fees, and other government fees that are collected from customers.

32.    The 2021 10-K purported to warn that "***If*** we fail to maintain the high standards on which our reputation is built, or if an actual, or alleged failure of these standards occurs that damages this reputation, it ***could*** adversely affect consumer trust and demand and have a material adverse effect on our business, sales, and results of operations." Moreover, "[e]ven the ***perception*** of a decrease in the quality of our customer service or brand could impact results." The 2020 10-K purported to warn of the following risk regarding regulatory compliance:

> *We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. Changes in these laws and regulations, or our failure to comply, could have a material adverse effect on our business, results of operations, and financial condition.*

18

We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration***, state laws regulating the sale of motor vehicles and related products and services, federal and state laws regulating advertising of motor vehicles and related products and services, and federal and state consumer protection laws prohibiting unfair, deceptive or misleading practices toward consumers. …

33.     The above statements identified in ¶¶ 30-32 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Carvana faced ongoing issues with documentation, registration, and title for many of its vehicles across the country; (2) that, as a result, Carvana was issuing frequent temporary plates; (3) that the suspension of Carvana's license in North Carolina was not a "relatively unusual" action and, in fact, the Company was under investigation by many states for violating laws and regulations regarding proper documentation and inspections; (4) that, as a result of the foregoing, there was a substantial risk to Carvana's ability to continue business and/or expand its business in existing markets; (5) that Carvana was facing imminent regulatory action including license suspension in several states; (6) that, as a result of the foregoing, Carvana faced increased oversight in certain states, including Illinois; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's

business, operations, and prospects were materially misleading and/or lacked a
reasonable basis.

### Disclosures at the End of the Class Period

34.     On June 24, 2022, after the market closed, *Barron's* published an article
entitled "Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars[,]"
which stated that "[i]n its haste to seize market share from competitors, Carvana was
selling cars faster than it could get them registered to their new owners." The article
stated, in relevant part:

> Barron's interviews with Carvana customers and former employees
> shed light on why registrations were delayed and how state regulators
> have tried to address the issue. ***The reporting reveals a company
> scrambling to address the problem, at one point forming an ad hoc
> unit known as the "undriveable-car task force."***
>
> Carvana says many of the delays involved internal paperwork
> problems, including errors on title documents, missing documents from
> buyers, and slow work by third-party registration services and state
> motor vehicle agencies.
>
> In other instances, though, including Burton's, Carvana sold cars before
> it had title to the vehicles, an action that is illegal in many states where
> the company does business.

35.     The article stated that Carvana repeatedly issued temporary plates to
customers in the face of delays registering vehicles:

> Shortly after Carvana opened its 28th vending machine tower in early
> 2021 near the Las Vegas Strip—there now are 33—JD Decker, the
> Nevada Department of Motor Vehicles' chief lawman, was patrolling
> the desert metropolis when he stopped a car for driving with an expired
> temporary license plate from North Carolina.

The driver told Decker he'd been getting one temporary license plate after another from Carvana, and was waiting for the next one. He showed Decker a stack of expired temporary plates from around the country he'd burned through.

"He probably had about 10 different states represented," Decker says. "He had the car for about a year and there was a problem with the title, so they just kept sending him temp tags from all over."

**Former Carvana employees say this was standard procedure by then: The company had started encountering delays in getting vehicles registered to its buyers, so it would use its dealer licenses across the country to issue temporary plates from multiple states to customers.**

"You might end up with a Tennessee temporary plate for 45 days, then an Ohio temporary plate for another 30 to 45 days," says a former senior member of the department at Carvana's Tempe headquarters that responds to the most serious customer complaints, known as the executive resolution team.

"Customers would end up getting sometimes four to six different temporary plates from multiple states," says the former staffer, who was laid off by the company after almost two years in April following a dispute over workplace accommodations for a disability. He asked not to be identified, citing ongoing litigation with the company over his dismissal.

Some of the sanctions levied by states in recent months cite the improper furnishing of temporary out-of-state plates. Carvana says it has "had a number of productive and helpful conversations with regulators across the country" on the topic of out-of-state plates and is "very confident in our processes going forward."

36.    The article further stated that Carvana increased staffing in early 2021

"to deal with title issues." It stated, in relevant part:

By early 2021, Carvana was staffing up to deal with title issues. That's when Thomas Hollingsworth joined what he was told was a newly formed titles department at the Tempe headquarters tasked with solving

21

issues that were keeping cars from getting registered to their new owners.

Until he left the department for another role at Carvana that August, Hollingsworth—who has also since left the company—spent his days on the phone with banks, state motor vehicle departments, and former owners working to fix paperwork snags.

"I would come in at 7 a.m. and I would leave around 2:30 p.m., and the whole day was basically running through these titles," he says.

***During a period of heavy hiring that fall, Carvana established a new category of staffers called "paperwork specialists" to better manage the documents that flowed in and out of the company with the cars it bought and sold, says a former member of the auto dealer's recruiting team.***

The paperwork specialists were entry-level workers making $15 an hour who were sent out in the field after two weeks of rudimentary instruction, says the former recruiter, whose job was among those lost in the May layoffs and who asked not to be identified for fear of reprisal.

37.     According to the article, "Carvana's sense of urgency surrounding the title-transfer issues may be most apparent in its formation of the undriveable-car task force in May." Specifically:

***Samantha Berger, another former member of the executive resolution team, says three of her colleagues were pulled aside for specialized vehicle-registration training early that month and given a "giant spreadsheet" of cars.***

***The cars were ones that Carvana had been keeping on the road with temporary plates that were now expiring, leaving them to languish, undriveable and parked outside new owners' homes, says Berger, who wound up leaving the company days later, shortly before the layoffs.***

Asked about the undriveable-car task force, Carvana says that its "internal teams have done an incredible job solving unprecedented

business process challenges associated with a global pandemic in realtime."

From his perch in Carvana's titles department, Hollingsworth says he was able to see where the company's process went wrong: Sometimes cars got sold off its lots around the country before document handlers in Tempe had time to finish getting the cars' titles transferred to Carvana.

38.   The article cited the suspensions by multiple states due to Carvana's

failure to meet registration requirements and that these issues "resulted in increased

oversight in Illinois":

Carvana was also facing scrutiny from state motor vehicle agencies over the company's failure to meet vehicle registration deadlines and the use of out-of-state permits by its customers.

***Early this year, Pennsylvania officials suspended the company's license to issue temporary permits at its two vending-machine towers in that state, in Philadelphia and near Pittsburgh, citing late document submittals, "improper issuance and verification of temporary Pennsylvania plates in other states," and other violations, Pennsylvania Department of Transportation spokesman Diego Sandino said in an email.***

The suspension at the Philadelphia location is active until August, Sandino says. The location near Pittsburgh is suspended for three months after it comes into compliance, which as of late May it hadn't yet done.

The Pennsylvania actions came in response to "temporary technical operational challenges that have since been corrected," Carvana says. "This does not impact our ability to sell cars in Pennsylvania." The company is still able to issue temporary license plates in the state through a third-party licenser, it says.

***Issues related to late title transfers and the use of out-of-state plates have also resulted in increased oversight in Illinois, where the company was forced to cease business entirely for about two weeks in***

23

*May. A suspension in a North Carolina county ended in January, though the company remains on probation in another North Carolina county. Carvana's license is also on probation in Michigan over registration issues.*

39.     On this news, the Company's stock fell $6.78, or 21%, over two consecutive trading sessions to close at $24.74 per share on June 28, 2022, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Carvana securities between May 6, 2020 and June 24, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Carvana's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Carvana shares were traded publicly during the Class Period on the

NYSE. Record owners and other members of the Class may be identified from records maintained by Carvana or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Carvana; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

45.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

46.    The market for Carvana's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Carvana's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Carvana's securities relying upon the integrity of the market price of the Company's securities and market information relating to Carvana, and have been damaged thereby.

47.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Carvana's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they

failed to disclose material adverse information and/or misrepresented the truth about Carvana's business, operations, and prospects as alleged herein.

48.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Carvana's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

49.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

50.     During the Class Period, Plaintiff and the Class purchased Carvana's securities at artificially inflated prices and were damaged thereby.  The price of the

Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

51.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Carvana, their control over, and/or receipt and/or modification of Carvana's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Carvana, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

52.   The market for Carvana's securities was open, well-developed and efficient at all relevant times.   As a result of the materially false and/or misleading statements and/or failures to disclose, Carvana's securities traded at artificially

inflated prices during the Class Period.  On August 10, 2021, the Company's share price closed at a Class Period high of $370.10 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Carvana's securities and market information relating to Carvana, and have been damaged thereby.

53.     During the Class Period, the artificial inflation of Carvana's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Carvana's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Carvana and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

54.     At all relevant times, the market for Carvana's securities was an efficient market for the following reasons, among others:

(a)     Carvana shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Carvana filed periodic public reports with the SEC and/or the NYSE;

(c)     Carvana regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Carvana was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

55.   As a result of the foregoing, the market for Carvana's securities promptly digested current information regarding Carvana from all publicly available sources and reflected such information in Carvana's share price. Under these circumstances, all purchasers of Carvana's securities during the Class Period suffered similar injury through their purchase of Carvana's securities at artificially inflated prices and a presumption of reliance applies.

56.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

57.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking

statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Carvana who knew that the statement was false when made.

## **FIRST CLAIM**

### **Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

58.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Carvana's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

60.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Carvana's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

61.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Carvana's financial well-being and prospects, as specified herein.

62.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Carvana's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Carvana and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth

more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

63.   Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

64.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts

were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Carvana's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

65.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Carvana's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members

of the Class acquired Carvana's securities during the Class Period at artificially high prices and were damaged thereby.

66.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Carvana was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Carvana securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

67.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

69.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

36

70.    Individual Defendants acted as controlling persons of Carvana within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72.    As set forth above, Carvana and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants

are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 29, 2022          By:  /s/ James E. Cecchi
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road

Roseland, New Jersey 07068
Telephone: (973) 994-1700

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Counsel for Plaintiff*